In re the Matter of P. F., Jr., A Minor, Petitioner-Appellee,

v.

James WALSH, Director, Pueblo County Department of Social Services, A. L. S., believed to be Ann L. Schmuck, Supervisor; Antoinette Avery, Caseworker; Dr. Haydee Kort, Superintendent of the Colorado State Hospital, Pueblo, Colorado; and Karen Howard, M.D., Child and Adolescent Treatment Center, Colorado State Hospital, Pueblo, Colorado, Respondents-Appellants.

No. 80SA569.

Supreme Court of Colorado, En Banc.

June 28, 1982.

Rehearing Denied Aug. 16, 1982.

Pueblo County Legal Services, Inc., Montie L. Barringer, Mitchell B. Solomon, Pueblo, for petitioner-appellee.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Patricia W. Robb, Asst. Atty. Gen., Denver, William Thiebaut, Jr., Sp. Asst. County Atty., Phillip Robert James, Asst. County Atty., Pueblo, for respondents-appellants.

ROVIRA, Justice.

The Pueblo County Department of Social Services (Pueblo Social Services) and the Colorado State Hospital (psychiatric hospital) appeal[1] a judgment of the District Court in and for the County of Pueblo holding that section 27–10–103(3), C.R.S. 1973,[2] was unconstitutional. We affirm.

## I.

P. F., Jr., a thirteen-year-old minor in the legal custody of Pueblo Social Services[3] filed a petition for a writ of habeas corpus in the Pueblo District Court. He alleged that he was committed to and incarcerated in the Colorado State Hospital against his will and without the benefit of rights conferred by statutes requiring certification prior to involuntary commitment to a psychiatric facility.[4] He alleged further that section 27–10–103(3), C.R.S. 1973, had been found to be unconstitutional. See In re the Matter of K. W. v. Kort, No. C–2030 (Colo. D.Ct. Pueblo, Feb. 8, 1979).

The court received evidence on August 26 and 28, 1980. On the first day, it was established that P. F., Jr., was admitted to the Colorado State Hospital on July 3, 1980. The admission was characterized as being voluntary in that P. F., Jr., and Pueblo Social Services, as his legal guardian, both signed a voluntary admission request. Further, the hospital had P. F., Jr., individually sign an admission request, apparently believing that the original document had been lost.

Dr. Karen Brody, a psychiatrist at the state hospital, then testified concerning admission and release procedures. She stated that if a voluntary patient asked to be discharged he would be evaluated by the staff and, if not certifiable,[5] he would be released. She also said that if P. F., Jr., asked to be released he would be evaluated and, if not certifiable, he would be released regardless of whether or not Pueblo Social Services concurred in the decision.

P. F., Jr., then took the witness stand and executed a written document revoking his

---

1. This appeal was filed initially with the Colorado Court of Appeals. A request for a determination of jurisdiction was filed with this court pursuant to section 13–4–110(1)(a), C.R. S.1973. We accepted jurisdiction because the constitutionality of a statute is in question. See section 13–4–102(1)(b), C.R.S.1973.

2. Section 27–10–103(3), C.R.S.1973, provides: "Voluntary applications for mental health services.

. . . .

(3) Nothing in subsection (2) of this section shall be construed to require the consent of any minor to receive mental health services when the parent or legal guardian of the minor makes voluntary application for such services on his behalf or to limit the application to minors of the provisions of this article concerning involuntary evaluation, care, and treatment."

3. Pueblo Social Services obtained legal custody of P. F., Jr., pursuant to court order terminating the parental rights of P. F., Jr.'s natural parents. See People in the Interest of M. F., P. F., Jr., and T. F., and concerning P. F. and M. F., No. J–4079 (Colo.D.Ct.Pueblo, May 12, 1975).

4. See, e.g., sections 27–10–107, 108 & 111, C.R. S.1973 (Vol. 11 & 1981 Supp.).

5. Involuntary commitment requires certification under section 27–10–107 or 108, C.R.S. 1973 (Vol. 11 & 1981 Supp.). This entails, inter alia, a finding that the person is mentally ill and as a result, a danger to himself or others, or gravely disabled.

signature on the admission request and asked to be released. The court then recessed and continued the matter pending an evaluation of P. F., Jr., by Dr. Brody.

On August 28, the hearing resumed, and Dr. Brody testified that she evaluated P. F., Jr., and concluded that he was not certifiable. It was her opinion that P. F., Jr., was mentally ill, suffering an unsocialized aggressive reaction of adolescence. This diagnosis was based upon his disobedience, quarrelsomeness, lying, stealing, temper, and his destructive, vengeful tendencies. Dr. Brody, however, did not feel that P. F., Jr., was either a danger to himself or to others or gravely disabled for purposes of certification.

Dr. Brody indicated, in apparent contradiction to her pre-evaluation testimony, that a minor, voluntarily admitted by his parents or legal guardian, would not be released upon his request even if he was not certifiable, as long as he was mentally ill, in need of treatment, and his parents or guardians agreed with the psychiatrist's recommendation for continued treatment. Therefore, P. F., Jr., would not be permitted to leave the hospital.

The court entered its findings of fact and conclusions of law on October 30, 1980. It found that P. F., Jr., signed the voluntary admission forms, having been told to do so, but at no time did he desire to be admitted to the psychiatric hospital and, further, that P. F., Jr., was mentally ill but was not certifiable under Colorado mental health statutes.

The court also found that the hospital had promulgated regulations governing admission to the facility and the hospital department to which P. F., Jr., was assigned[6] had its own internal admission guide; further, that Dr. Brody was not familiar with the regulations at the time of P. F., Jr.'s admission and, although some of the procedures set forth in the guide were in fact complied with, procedures calling for an evaluation by an area mental health clinic were not followed.

In entering its order granting the writ of habeas corpus, the court concluded that P. F., Jr., was deprived of liberty and procedural safeguards as provided under *U.S. Const.* amend. XIV and *Colo.Const.* art. II, sec. 25, and that section 27–10–103(3), C.R.S. 1973, discriminated without any rational basis against juveniles who object to commitment but whose parents or legal guardians have requested such commitment, as opposed to juveniles committed voluntarily under section 27–10–107, C.R.S. 1973. This discrimination was found to occur as a result of permitting commitment under section 103(3) without proof of mental illness, dangerousness to self or others or grave disability, or that the treatment facility was the least restrictive environment. Accordingly, the court determined that section 103(3) was unconstitutional and void as a violation of the Colorado and federal right to due process and equal protection under the law.

II.

The issue presented is whether, under section 27–10–103(3), C.R.S.1973, a minor may be admitted to the state psychiatric hospital against his will but with the approval of his legal guardian.

Section 27–10–103 provides for voluntary applications for mental health services. Subsection (2) allows a minor fifteen years or older to consent to receive mental health services with or without the consent of a parent or legal guardian. Section 27–10–103(2), C.R.S.1973 (1981 Supp.). The provision applicable in the present case provides:

"(3) Nothing in subsection (2) of this section shall be construed to require the consent of any minor to receive mental health services when the parent or legal guardian of the minor makes voluntary application for such services on his behalf or to limit the application to minors of the provisions of this article concerning involuntary evaluation, care, and treatment."

---

**6.** P. F., Jr., received treatment from the Child and Adolescent Treatment Center of the Colorado State Hospital.

The trial court concluded that section 27–10–103(3) was unconstitutional and void as a violation of due process and equal protection rights under *U.S.Const.* amend. XIV and *Colo.Const.* art. II, sec. 25. We agree that the statutory provision is unconstitutional. Given recent declarations by the United States Supreme Court in *Parham v. J. R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), and *Secretary of Public Welfare v. Institutionalized Juveniles*, 442 U.S. 640, 99 S.Ct. 2523, 61 L.Ed.2d 142 (1979), establishing the scope of federal due process protections afforded juveniles who protest the decision of a parent or legal guardian to voluntarily commit the minor to a psychiatric facility, we find it unnecessary to decide the issue under the equal protection clause of *U.S.Const.* amend. XIV or *Colo.Const.* art. II, sec. 25.

■ It is beyond dispute that a minor has a protectible liberty interest in being free from the physical restraints attendant to commitment in a psychiatric hospital. *Parham v. J. R., supra. See Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *Humphrey v. Cady*, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972). *See also People v. Chavez*, Colo., 629 P.2d 1040 (1981); *People v. Taylor*, Colo., 618 P.2d 1127 (1980). Further, the state's role in the commitment process, as the minor's legal guardian and the operator of the psychiatric facility, establishes the state action necessary for the invocation of federal due process protections. *See Parham v. J. R., supra; Addington v. Texas, supra.*

In *Parham v. J. R., supra*, the United States Supreme Court reversed a decision of the district court which found that the voluntary commitment procedures for children under the age of eighteen established by the Georgia legislature were unconstitutional under the due process clause, *U.S. Const.* amend XIV. *See J. L. v. Parham*,

412 F.Supp. 112 (M.D.Ga.1976). The two statutory provisions before the Court provided:

"The superintendent of any facility may receive for observation and diagnosis ... any individual under 18 years of age for whom such application is made by his parent or guardian.... *If found to show evidence of mental illness and to be suitable for treatment*, such person may be given care and treatment at such facility and such person may be detained by such facility for such period and under such conditions as may be authorized by law."

Ga.Code § 88–503.1 (1975) (emphasis added).

"The superintendent of the facility shall discharge any voluntary patient who has recovered from his mental illness or who has sufficiently improved that the superintendent determines that hospitalization of the patient is no longer desirable."

Ga.Code § 88–503.2 (1975).

The Georgia statute did not provide specific procedures to be used by the superintendent in making his determination as to admission. Further, the state mental health director had not promulgated statewide regulations defining procedures to be used by hospital superintendents when admitting minors under Ga.Code § 88–503.1 (1975). Rather, the superintendent of each hospital was responsible for establishing admission procedures to be used by his or her staff.[7]

In analyzing the Georgia scheme under the due process clause, the Court first restated well-established principles to be used in testing state procedures under due process attack. The following factors must be balanced:

" 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of

**7.** In *Secretary of Public Welfare v. Institutionalized Juveniles*, 442 U.S. 640, 99 S.Ct. 2523, 61 L.Ed.2d 142 (1979), the Supreme Court upheld a statutory commitment scheme established by the Pennsylvania legislature. The Pennsylvania statute, unlike the Georgia statute, provided

specific procedures to be employed when admitting minors voluntarily to state psychiatric hospitals. The Court applied the due process test established in *Parham* and concluded that the Pennsylvania scheme was permissible.

additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'"

*Parham v. J. R., supra,* 442 U.S. at 599–600, 99 S.Ct. at 2502–03, 61 L.Ed.2d at 117.

After stating the interests of the child, the parent and the state, the Court set forth the procedural protections mandated by the Constitution:

"We conclude that the risk of error inherent in the parental decision to have a child institutionalized for mental health care is sufficiently great that some kind of inquiry should be made by a 'neutral factfinder' *to determine whether the statutory requirements for admission are satisfied....* That inquiry must carefully probe the child's background using all available sources, including, but not limited to, parents, schools, and other social agencies. Of course, the review must also include an interview with the child. It is necessary that the decisionmaker have the authority to refuse to admit any child who does not satisfy the medical standards for admission. Finally, it is necessary that the child's continuing need for commitment be reviewed periodically by a similarly independent procedure.

"We are satisfied that such procedures will protect the child from an erroneous admission decision in a way that neither unduly burdens the states nor inhibits parental decisions to seek state help." [8]

*Id.,* 442 U.S. at 606–07, 99 S.Ct. at 2506, 61 L.Ed.2d at 121–22 (citations and footnote omitted) (emphasis added).

The Court then upheld the Georgia commitment process, ruling that: the neutral fact finder could be a staff physician who had the authority to refuse admission and who was free to evaluate the child's condition and need for treatment; a formal or quasi-formal hearing was not mandated; and informal but well-established medical diagnostic procedures would suffice.

Like Georgia, Colorado has not established specific procedures, either by statute or by statewide agency regulation, controlling the admission of minors to state psychiatric facilities. As in Georgia, Colorado admission procedures have been developed by the state hospital.

■ Nonetheless, we conclude that the Colorado commitment scheme, as it relates to minors admitted for treatment by their parents or legal guardian, is unconstitutional. Section 27–10–103(3), C.R.S.1973, cannot withstand constitutional scrutiny because, unlike the Georgia statute, it contains no admission standard to be applied by the hospital staff when determining whether or not to accept a minor for treatment. Section 88–503.1 of the Georgia Code requires that the minor be found to show evidence of mental illness and be suitable for treatment prior to admission.

Thus, in *Parham v. J. R., supra,* the Court approved a scheme where the legislature had established statutory admission requirements. The Georgia hospital was allowed to develop the procedure to be employed by a "'neutral factfinder' to determine whether the statutory requirements for admission [were] satisfied." *Id.,* 442 U.S. at 606, 99 S.Ct. at 2506, 61 L.Ed.2d at 121. Here in Colorado, the hospital has developed the admission standard as well as the procedures to be used to determine if the standard has been satisfied.[9]

■ We do not believe that this comports with due process standards under *U.S. Const.* amend. XIV or *Colo.Const.* art. II, sec. 25. By allowing the psychiatric hospital to set the admission standard, procedural guidelines, and to serve as the "neutral factfinder" entrusted to make the final admission determination, the legislature has

---

**8.** The *Parham* majority held that while the determination of what process is due varies when the child is a ward of the state and the state rather than a natural parent requests commitment, "the differences ... do not justify requiring different procedures at the time of the ... initial admission...." *Parham v. J. R.,* 442

U.S. at 617–18, 99 S.Ct. at 2512, 61 L.Ed.2d at 128.

**9.** Admission criteria for the Child and Adolescent Treatment Center was as follows:

"Admission of the child or adolescent to inpatient treatment is based upon the determination that:

provided no standards or limits in the statute to guard against arbitrary and inconsistent application. *See Johnson v. Solomon*, 484 F.Supp. 278 (D.Md.1979); *Goldy v. Beal*, 429 F.Supp. 640, 648 (M.D.Pa.1976); *People v. Taylor, supra. See also Pierce v. Industrial Comm'n*, 195 Colo. 10, 576 P.2d 1012 (1978). More important, we believe that the lack of a statutory admission standard cannot be cured by guidelines developed by the individual hospitals. Given the substantial liberty interest at stake and the risk of an erroneous admission decision, we conclude that the hospital, as the party ultimately responsible for determining whether a child will be admitted, cannot be delegated the legislative responsibility of defining the admission standard. *See Parham v. J. R., supra.*

Judgment affirmed.

"The child or adolescent requires treatment of a comprehensive and intensive nature and is likely to benefit from the programs that the Child and Adolescent Treatment Center has to offer; and alternatives for less intensive treatment are not suitable."